[No. 35606-6-II.   Division Two.   April 15, 2008.]

THE STATE OF WASHINGTON, *Respondent,* v. JESSIE J. EICHELBERGER, *Appellant.*

---

*Manek R. Mistry* and *Jodi R. Backlund* (of *Backlund & Mistry*), for appellant.

*H. Steward Menefee, Prosecuting Attorney*, and *Katherine L. Svoboda, Deputy*, for respondent.

¶1 Armstrong, J. — Jessie J. Eichelberger appeals his conviction of first degree escape. He argues that he was not

in custody as required for that crime because the trial court had not yet signed a written order placing him in custody when he fled the courtroom. Alternatively, Eichelberger argues that the court's oral order was not sufficiently clear to take him into custody. Finally, Eichelberger argues that the evidence was insufficient to prove that he knew he was in custody. We affirm.

## FACTS

¶2 On June 6, 2006, a jury found Jessie Eichelberger guilty of unlawful possession of a firearm. After the judge excused the jury, he attempted to schedule sentencing. Before the parties could discuss a date, the deputy prosecutor asked the judge to revoke Eichelberger's release because Eichelberger had inappropriately contacted two witnesses before his trial. Defense counsel argued that the judge should not revoke Eichelberger's release because there was no testimony that Eichelberger had done anything wrong and because the $10,000 bond had "been enough to assure his appearance here in court, going to assure his appearance at sentencing." Report of Proceeding (RP) at 87. The prosecutor clarified that Eichelberger's conviction had exonerated his bond. The judge affirmed that bond had been exonerated and asked a few questions about the contact and Eichelberger's sentencing range. The judge then announced, "All right. I'm going to have him taken into custody." RP at 88. The court clerk called the jail to summon a deputy.

¶3 When he heard the judge's announcement, Eichelberger became nervous and stood up to argue. The judge tried to respond, but Eichelberger interrupted, causing the judge to state, "Have a seat, sir." RP at 88-89. Eichelberger began to argue again, and the judge interrupted, saying, "Sir, I am going to find you in contempt. Have a seat." RP at 89. Eichelberger then jumped up from the table where he had been sitting, leaped over a low railing behind him, and "bent straight forward at the waist so that his head was pointing

toward the door, and he ran very fast toward the door bent over." RP at 30. In so doing, Eichelberger almost knocked his attorney over. As Eichelberger left the courtroom, the judge yelled, "That's an escape. That's an escape. That's an escape." RP at 89. Eichelberger ran out of the courthouse to a car, stopped for a minute or two, and then ran off. Eichelberger left his shoes on the sidewalk in front of the courthouse.

¶4 The State charged Eichelberger with first degree escape and resisting arrest.[1] At a bench trial, the judge, the deputy prosecutor, the court clerk, and the court reporter from his unlawful possession trial testified to the events described above. In his defense, Eichelberger maintained that he did not know that he was in custody when he fled the courtroom. He testified that he never would have left the courtroom had he known that he was in custody. Eichelberger asserted that he did not understand what the judge meant when he said that his bond was exonerated. He explained that he understood the judge's statement "I'm going to have him taken into custody" to be a future reference, RP at 70, and the judge's order to sit down to mean that the judge "was going to finish what he was doing," not that the judge was ordering him into custody. RP at 71. Eichelberger also described his history of panic attacks; he testified that he couldn't hear the judge yelling "[t]hat's an escape" because he was having a panic attack.

¶5 The trial court found Eichelberger guilty on both counts. In concluding that Eichelberger knowingly escaped from custody, the trial court recounted the events of Eichelberger's escape, using a transcript of the earlier trial. The trial court noted that Eichelberger's impassioned argument against revoking his release suggested that he understood what was happening. And the trial court emphasized that by running out of the courtroom Eichelberger demon-

---

[1] The resisting arrest charge stemmed from the events surrounding Eichelberger's eventual arrest. Eichelberger has not appealed that conviction.

strated that he understood that the judge had ordered him taken into custody. The trial court concluded that the evidence supported a conviction of first degree escape.

## ANALYSIS

### I. CUSTODY

## A. Adequacy of an Oral Order

¶6 Eichelberger argues that he was not in custody when he left the courtroom, as required for a conviction of first degree escape, because the judge had not yet issued a written order placing him in custody. RCW 9A.76.010 defines "custody" to include custody pursuant to a court order; Eichelberger asserts that, under the rule of lenity, we must interpret the statute as requiring a written court order.

¶7 We review questions of statutory interpretation de novo. *State v. Ammons*, 136 Wn.2d 453, 456, 963 P.2d 812 (1998). In interpreting statutes, we seek to give effect to the legislature's intent. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003). If a statute's meaning is plain on its face, we follow that meaning without resorting to statutory construction. *State v. Delgado*, 148 Wn.2d 723, 727, 63 P.3d 792 (2003). But if a statute's language is subject to more than one reasonable interpretation, the statute is ambiguous and we must construe it to reach the legislature's intent. *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996). We give words their plain and ordinary meaning and avoid interpretations that lead to unlikely, absurd, or strained results. *State v. Hendrix*, 109 Wn. App. 508, 512, 35 P.3d 1189 (2001); *see also Ammons*, 136 Wn.2d at 457-58.

¶8 A person is guilty of first degree escape if he "knowingly escapes from custody or a detention facility while being detained pursuant to a conviction of a felony or an equivalent juvenile offense." RCW 9A.76.110(1). A person is in custody when he is in "restraint pursuant to . . . an

order of a court." RCW 9A.76.010(1). To commit first degree escape, the individual must be in custody, but he need not be under a detention separate from the restriction of freedom imposed by being in custody, even when the custodial restraint arises solely from a court order. *State v. Breshon*, 115 Wn. App. 874, 880, 63 P.3d 871 (2003) (applying *Ammons*, 136 Wn.2d at 460).[2]

¶9 Eichelberger is correct that the term "order," considered without a context, has two possible reasonable meanings: the dictionary defines "order" as "a command, direction, or instruction," as well as "[a] written direction or command delivered by a court or judge." BLACK'S LAW DICTIONARY 1129 (8th ed. 2004). But interpreting the term as used in RCW 9A.76.110 to mean only a written order leads to absurd results, which we avoid. *Ammons*, 136 Wn.2d at 457. If "order of a court" in RCW 9A.76.010 means only a written order, a newly convicted defendant would face considerable temptation to leave the courtroom before the judge could reduce his or her oral order imposing custody to writing. We cannot conceive that the legislature intended to allow such disruptions in the postconviction courtroom setting.

¶10 Moreover, we disagree with Eichelberger's contention that the court's contempt powers are sufficient to address this absurdity. A court may punish an individual in contempt of court with, at most, a $5,000 fine or a year-long confinement in county jail. RCW 7.21.040(5). The maximum punishment for first degree escape, a class B felony, is 84

_____

[2] Eichelberger argues that we should "revisit" our holding in *Breshon* because it does not give effect to all the terms in RCW 9A.76.110. Br. of Appellant at 9; Reply Br. of Appellant at 3. But *Breshon* does give effect to every word of the statute in deciphering our Supreme Court's decision in *Ammons*. The *Ammons* court held that a person is in custody under a court order when the court orders him to serve on a work crew. *Ammons*, 136 Wn.2d at 460. We explained that the *Ammons* court might have read the statute with the emphasis on "felony conviction" to provide that only a defendant held on a felony conviction, as opposed to a misdemeanor conviction, can commit first degree escape; alternatively, the court might have concluded that "detained" and "custody" have the same meaning under the statute. *Breshon*, 115 Wn. App. at 880. In any event, *Ammons* did not hold that a separate detention is an element of first degree escape, and *Breshon* is entirely consistent with *Ammons*. We decline to revisit the issue.

months' imprisonment and a $20,000 fine. RCW 9.94A.510, .515; RCW 9A.76.110(3). And a first degree escape conviction carries the punishments inherent in all felonies, such as the loss of voting rights. *See* WASH. CONST. art. VI, § 3; RCW 29A.04.079. Thus, the temptation for a convicted defendant to make a speedy courtroom exit between the entry of an oral and written ruling would remain if he risked only a finding of contempt.

¶11 In addition, RCW 10.64.025 supports our conclusion that an oral court order is sufficient to impose custody. That statute provides that the defendant "shall be detained" upon conviction unless the trial court finds that he meets certain criteria, and that the defendant's bail bond "shall . . . be exonerated" upon conviction.[3] The statute operates as a matter of law; it does not require a written court order. *State v. French*, 88 Wn. App. 586, 593, 945 P.2d 752 (1997). We have described RCW 10.64.025 as the legislature's response to prior case law holding that a trial court's oral order of judgment and sentence was neither conclusive nor final. *French*, 88 Wn. App. at 592-93. Thus, at the moment of conviction, a court order other than a written order is binding and conclusive. This interpretation of RCW 10.64.025 furthers public policy because, upon being convicted, the defendant no longer benefits from the presumption of innocence and is more likely to flee. *French*, 88 Wn. App. at 593. Giving effect to an oral order imposing custody furthers the same public policy. We conclude that under RCW 9A.76.010, a trial court can orally order a convicted defendant to be in custody.

## B. Clear and Unambiguous Oral Order

¶12 Eichelberger asserts that, even if an oral order suffices, the order must clearly and unambiguously estab-

---

[3] RCW 10.64.025(1) provides:

A defendant who has been found guilty of a felony and is awaiting sentencing shall be detained unless the court finds by clear and convincing evidence that the defendant is not likely to flee . . . if released. Any bail bond that was posted on behalf of a defendant shall, upon the defendant's conviction, be exonerated.

lish that the court has sufficiently limited the person's liberty to constitute custody. Eichelberger argues that the judge's order in his case was not sufficiently clear.

¶13 Eichelberger identifies two statements that possibly constituted an order to take him into custody: "I'm going to have him taken into custody" or "sit down." Br. of Appellant at 6-7. Eichelberger argues that the former is inadequate because it is in the future tense and that the latter is inadequate because it does not impose sufficient restraints to constitute custody.

¶14 Regardless of the adequacy of the latter statement, the first is sufficiently clear to have placed Eichelberger in custody. The judge announced, "All right. I'm going to have him taken into custody," after hearing argument from both parties about whether to revoke Eichelberger's release. RP at 88. Taken in context, the judge's use of the future tense does not make the statement one of future intent. Rather, his phrasing implies that he was "going to take" Eichelberger into custody at the time (now), not at some future time. The jury had just convicted Eichelberger; the conviction exonerated Eichelberger's bail. The attorneys' arguments dealt with whether Eichelberger should be allowed to remain free or be taken into custody at that time. We are confident that no reasonable person could have understood the proposed alternatives to be (1) that Eichelberger would be free to leave the courtroom without condition or (2) that he would be free to leave the courtroom to be taken into custody at some time in the future. Such alternatives would utterly fail to address the State's concern that Eichelberger was an increased flight risk after his conviction.

¶15 In addition, the people in the courtroom who heard the judge's statement reacted as if the statement had immediate effect. The court clerk called the jail without prompting because she understood the statement as having immediate effect. That Eichelberger ran out of courtroom as soon as he realized that the judge was not going to release him strongly suggests that he understood the judge was

ordering immediate custody. We hold that the judge's order was sufficiently clear to give Eichelberger notice that he was being taken into custody at the time.

## II. Sufficiency of the Evidence

¶16 Eichelberger argues that the State failed to prove that he knowingly escaped from custody as RCW 9A.76.110 requires. Specifically, he reasons that the State failed to prove beyond a reasonable doubt that (1) he knew what it meant to have his bail exonerated, (2) he understood he was immediately placed in custody by the judge's order, and (3) he understood the judge's admonition to "sit down" to place him in custody. Eichelberger also contends that the judge's warnings as he fled notified him only that he was potentially guilty of escape, not that he was in custody.

¶17 Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). By claiming insufficiency, Eichelberger admits the truth of the State's evidence and all reasonable inferences that can be drawn from it. *Salinas*, 119 Wn.2d at 201. Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). Credibility determinations are the province of the trier of fact, and its determinations are not subject to review. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

¶18 Eichelberger testified at trial that he did not know he was committing an escape when he fled the courtroom. He thought the issue of whether he was being taken into custody was still unresolved. He testified that he did not know what exonerated meant, that he understood the judge's statement "I'm going to have you taken into custody" to be a future reference, that he did not understand the judge telling him to sit down to mean that he was in custody, and that he did not hear the judge yelling

"[t]hat's an escape" as he was leaving the courtroom because he was having a panic attack.[4] RP at 71.

¶19 The evidence was, however, more than sufficient to prove beyond a reasonable doubt that Eichelberger knew he was in custody and intentionally fled. Eichelberger's attempt to convince the judge not to revoke his release suggests that he understood that his release had been revoked. And Eichelberger not only listened to his attorney argue the point, but after the judge ruled, Eichelberger himself continued to argue with the judge.

¶20 Moreover, that Eichelberger ran from the courtroom supports the conclusion that he knew he was in custody. The court reporter testified that Eichelberger became "a little bit antsy when the clerk went to call for a deputy." RP at 12. He began looking around, stood up, and then jumped over a low railing from behind the table where he had been sitting. The court clerk testified that Eichelberger ran toward the courtroom entrance, "bent straight forward at the waist so that his head was pointing toward the door, and he ran very fast toward the door bent over." RP at 30. The deputy prosecutor remembered that Eichelberger "nearly ran over" his attorney, passing him so closely that his attorney, who had been standing, sat down. RP at 26. The deputy prosecutor also testified that Eichelberger had had difficulties running because his shoes were untied, and when he came out of the courthouse, he saw Eichelberger's shoes on the sidewalk in front of the courthouse. In addition, the judge yelled at Eichelberger several times when he was fleeing that "[t]hat's an escape."

¶21 Although Eichelberger denied knowing that he was in custody and testified that he did not hear the judge yell

---

[4] To the extent that Eichelberger suggests that the State had to prove he knew he was committing a crime, we disagree. *See State v. Locati,* 111 Wn. App. 222, 227, 43 P.3d 1288 (2002) (generally, ignorance of the law is no defense to a criminal charge). But we agree generally with Eichelberger's claims that the State had to prove that he knew that his actions would result in leaving custody without permission and thus he had to know that he was in custody. *See Ammons,* 136 Wn.2d at 456 n.3 (citing *State v. Danforth,* 97 Wn.2d 255, 258-59, 643 P.2d 882 (1982)).

at him, the trial court was not obligated to believe his testimony. *Camarillo*, 115 Wn.2d at 71. And after weighing the persuasive force of the circumstantial evidence, the trial court found that Eichelberger knew that he was in custody when he ran from the courtroom. The evidence is more than sufficient to support the escape conviction.

¶22 Affirmed.

HOUGHTON and QUINN-BRINTNALL, JJ., concur.